UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | ) ) ) | No. |
| | ) | Judge |
| Plaintiff, | ) ) | CLASS ACTION |
| | ) | |
| vs. | ) | |
| | ) | |
| NORFOLK SOUTHERN CORPORATION, ALAN H. SHAW, JAMES A. SQUIRES, and MARK R. GEORGE, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Plaintiff Bucks County Employees Retirement System ("plaintiff"), individually and on behalf of all other persons similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by Norfolk Southern Corporation ("Norfolk Southern" or the "Company"), as well as media reports about the Company and the facts alleged herein.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Norfolk Southern common stock between October 28, 2020 and March 3, 2023, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Norfolk Southern and certain of the Company's senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and events and omissions giving rise to the claims asserted herein occurred in substantial part in this District.  The statements alleged

---

[1]      Emphasis has been added unless otherwise noted.

to be materially false and misleading were disseminated into this District and injured Class members (defined herein) residing in this District. In addition, the allegations in this case involve a series of Norfolk Southern train derailments, at least one of which occurred in this District. Moreover, Norfolk Southern maintains extensive lobbying efforts in this District to influence transportation and railroad safety legislation including by use of a lobbying firm located in this District.

5.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

6.     Plaintiff Bucks County Employees Retirement System, as set forth in the accompanying certification, which is incorporated by reference herein, purchased Norfolk Southern common stock during the Class Period and has been damaged thereby.

7.     Defendant Norfolk Southern is a rail transportation company. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "NSC."

8.     Defendant Alan H. Shaw ("Shaw") has been Chief Executive Officer ("CEO") of Norfolk Southern since May 1, 2022 and President since December 1, 2021. Shaw has been a Director of Norfolk Southern since 2022. Shaw previously served as Norfolk Southern's Executive Vice President and Chief Marketing Officer, Vice President Intermodal Operations, and in various other positions since joining the Company in 1994.

9.     Defendant James A. Squires ("Squires") served as Chairman of the Board of Directors (the "Board") and CEO of Norfolk Southern from 2015 to May 2022. Squires served as the Company's President from June 2013 until December 2021. He has been a Director of the Company since 2014.

10.     Defendant Mark R. George ("George") has served as Executive Vice President and Chief Financial Officer ("CFO") of Norfolk Southern since November 2019.

11.     Defendants referenced above in ¶¶8-10 are referred to herein as the "Individual Defendants."   The Individual Defendants and the Company are referred to herein as the "defendants."

12.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

**The Company**

15. Defendant Norfolk Southern owns Norfolk Southern Railway Company ("NSR"), a major freight railroad. The Company was incorporated under the laws of the Commonwealth of Virginia on July 23, 1980. Norfolk Southern and its subsidiaries are primarily engaged in the rail transportation of raw materials, intermediate products, and finished goods in the Southeast, East, and Midwest and, via interchange with rail carriers, to and from the rest of the United States. The Company also transports overseas freight through several Atlantic and Gulf Coast ports. As of December 31, 2022, the Company operated approximately 19,100 route miles in 22 states and the District of Columbia. Norfolk Southern's footprint reaches numerous manufacturing plants, electric generating facilities, mines, distribution centers, transload facilities, and other businesses located in the Company's service area.

**Norfolk Southern's Adoption of "Precision Scheduled Railroading"**

16. Of the seven largest U.S. freight railroads – the so-called "Class I" railroads – six (including Norfolk Southern) currently report having implemented a strategy known as "Precision

Scheduled Railroading" ("PSR").[2]  PSR was pioneered by E. Hunter Harrison in the 1990s when he introduced it to Canadian National Railway Company and later implemented it at CSX Corporation after becoming its CEO.

17.     While there is no generally agreed-upon definition of PSR, PSR is associated with hyper-efficient operational changes designed to increase revenues and decrease costs.  Operational changes typically include reductions in staff; longer, heavier trains that can stretch up to miles in length; and tighter schedules.  At its core, PSR mandates trains to transport larger and heavier loads with fewer workers in less time.

18.     According to the U.S. Government Accountability Office ("GAO"), PSR is generally understood as an overarching strategy to increase a railroad's efficiency and reduce costs. Stakeholders, including representatives of railroads, employee unions, and shippers, told the GAO that PSR is associated with the following operational changes: (i) reductions in staff; (ii) longer trains; and (iii) reductions in assets such as locomotives.  The overall number of staff among the Class I freight railroads decreased by about 28% from 2011 through 2021.  As an example of the significant impact of PSR on the Company's operations, in 2022 Norfolk Southern employed an average of about 19,000 people compared with about 27,000 people 5 years earlier.  *The Wall Street Journal* has reported freight trains in some instances now stretching up to 3 miles long with 200 cars or more as a result of PSR policies.

19.     Initially, Norfolk Southern was opposed to PSR.  In November 2015, at a time when defendant Squires had been CEO of the Company for six months, Harrison, then CEO of Canadian Pacific Railway, approached Norfolk Southern regarding a potential merger pursuant to which

---

[2]     The seven Class I freight railroads are: BNSF Railway Co. ("BNSF"), Canadian National Railway (Grand Trunk Corporation), Canadian Pacific (Soo Line Corporation), CSX Transportation, Kansas City Southern Railway Co., Norfolk Southern Combined Railroad Subsidiaries, and Union Pacific Railroad Co.  BNSF, an indirect, wholly owned subsidiary of Berkshire Hathaway, is the lone Class I freight railroad not to have formally adopted PSR.

Norfolk Southern's operations would be "Hunterized" by implementing PSR.  Squires criticized the model, calling it a "short-term, cut-to-the-bone strategy that could cause Norfolk Southern to lose substantial revenues from our service-sensitive customer base."  Squires contended that PSR's hyperfocus on lower operating ratio would drive away truck-competitive traffic, among other long-term problems.

20.     A few years later, however, Norfolk Southern (with Squires still in charge) abruptly reversed course and announced on October 24, 2018 that the Company would adopt PSR principles as it developed a new operating plan that was purportedly aimed at producing better service at a lower cost.

21.     On February 11, 2019, at the Company's Investor and Financial Analyst Conference presentation, senior Norfolk Southern executives laid out Norfolk Southern's three-year transformational plan to implement PSR (which the Company referred to as the "Thoroughbred Operating Plan" or "TOP21").  The TOP21 plan included centralizing operations; reducing staff; running fewer, heavier, faster trains; and optimizing the Company's network in order to increase efficiency.

22.     Norfolk Southern identified its "Operating Ratio" as the key metric to measure its progress.  Operating Ratio was to be calculated by dividing the Company's operating expenses by the Company's operating revenues.  In essence, the Company sought to significantly increase revenues while cutting costs.  The Company set a goal of reducing its Operating Ratio to 60% by 2021 (it was then running at 65.4%).  In furtherance of this goal, Company executives determined that the railroad would need to cut headcount by 500 people in 2019 and by 3,000 people by 2021. Because the Company had already begun implementing some of the PSR changes by the time of the presentation, particularly improvements in train speed and dwell-time (the amount of time trains

spend in the terminal), the Company set a tight deadline to complete its transition, namely, full PSR implementation by 2021.

23. Norfolk Southern's 2019 annual report to shareholders highlighted the PSR overhaul to the Company's operations, stating in pertinent part as follows:

> 2019 was a year of transformation for Norfolk Southern. With a commitment to enhance shareholder value, we rolled out a new three-year plan to reimagine our company. Thanks to the hard work and determination of our employees, we made great progress, changing the way we operate our railroad, improving customer service, and building a foundation for long-term growth.
>
> *     *     *
>
> ***We set company records for train speed, which improved 17% year-over-year, and terminal dwell, which was down 30%.*** . . .
>
> ***Propelling these improvements was the adoption of our brand of precision scheduled railroading, or PSR.*** Thoughtful planning, customer collaboration, and diligent execution were the brand's hallmarks. In late 2018, we introduced PSR to the market with a "Clean Sheeting" initiative to streamline terminal operations and speed the flow of rail cars from yards to customers. ***In midyear 2019, we launched TOP21, a new operating plan that overhauls the way we run trains across the network. With TOP21, we're running fewer, heavier trains***, reducing circuity and train miles, reducing car handlings, ***and increasing network velocity***.

**Norfolk Southern Tied Executive Compensation
to Achieving the Company's PSR Goals**

24. In furtherance of its TOP21 Plan, Norfolk Southern began tying executive compensation to the Company's PSR objectives in 2019. The Company's Operating Ratio became a key metric, with its importance to executive compensation growing over time.

25. As set forth in the Company's March 31, 2022 annual proxy statement (the most recent available), pursuant to the Company's 2021 Executive Compensation Program, executives were to receive a base salary in a fixed-cash amount along with an annual incentive award (performance-based cash) ("Annual Incentive"). The Annual Incentive was "[d]esigned to compensate executives based on achievement of annual corporate performance results."

26.     The amount of the Annual Incentive was based on the achievement of certain performance metrics that were "chosen to encourage employees to do all they can individually and as a team to increase revenue, reduce expenses, improve operating performance, and achieve [the Company's] strategic objectives."

27.     The performance metrics for 2021's Annual Incentives were allocated as follows:  (i) operating ratio (60%); (ii) operating income (20%); and (iii) strategic objectives (20%).  With respect to strategic objectives, the Company acknowledged its strategic objectives were also linked to the Company's PSR objectives, stating in pertinent part as follows:

> To motivate continued focus on and progress toward all of our strategic objectives, the Committee determined in January of 2021 that the earnout of the 20% of annual incentive opportunity would be based on the Committee's evaluation of the Corporation's ***progress in continuing our transformation into a more productive and efficient organization; efforts to achieve operational excellence and propel smart growth***; leveraging technology as a catalyst to drive the productivity of our people, enhance the safety and efficiency of our operation, and enrich the experience of our customers; and aligning, engaging and developing our talent by promoting diversity, equity, and inclusion, and ensuring that employees understand how their work contributes to Norfolk Southern's success.

28.     Annual Incentives were at risk of having no value unless the threshold goals were achieved.  As it turned out, however, Norfolk Southern executives (including defendants) earned millions of dollars in awards as the Company's Operating Ratio dropped each year.  In 2021, when Norfolk Southern hit a record low Operating Ratio, it helped then-CEO Squires land nearly $3.5 million in cash – almost three times what he had earned the year before.  At least four other executives received more than a million dollars each, including the Company's current CEO Shaw, who was an executive vice president at the time.  Tellingly, in the Proxy Statement the Company filed with the SEC on March 31, 2022, Norfolk Southern highlighted its 2021 "***record performance for train length and weight***" as partial justification for why Company executives earned a cash payout that year.

**The Safety Concerns Attendant to Precision Scheduled Railroading**

29.    For years, safety concerns have been building in the railroad industry as a result of PSR and the growing length of trains and the industry's increased efforts to reduce costs and headcount.  Longer trains coupled with fewer personnel to inspect, maintain, and operate each train increase the potential for accidents.  Employees have described a system stretched to its limits, with one employee lamenting: "The workers are exhausted, times for car inspections have been drastically cut, and there are no regulations on the size of these trains."

30.    Indeed, these concerns were not illusory.  In December 2022, when the GAO reported on Norfolk Southern's accident rate, it found the Company had hit a 10-year high in 2021 with the Company's accident rate at its highest from 2019-2021.  In fact, the Company's Federal Railroad Administration ("FRA") train accident rate has increased for each of the last four years.  Similarly, the nation's seven Class 1 freight railroads suffered two derailments for every million miles traveled in 2022, compared to the 1.71 derailments per million miles in 2013, an increase of 17%.

31.    Critics within the industry have stated that the laser-focus on Operating Margin incentivizes executives to cut costs at the expense of safety.  "Railroads are seeking to have that number be the smallest, lowest number possible," according to Steven Ditmeyer, the former director of research and development at the FRA.  He explained: "You want to squeeze the costs and increase the revenues."

32.    Ditmeyer is among those who has connected the drive to lower operating costs – and thereby improve Operating Margin – directly to longer, more dangerous trains, stating: "The longer they make [the train], the per-car cost of labor is less.  And the longer trains have greater damage done, greater, larger pileups, fires and so on."

33.     According to Congressman Seth Moulton: "This is basic physics.  If you have really long trains, you have bigger forces in those trains . . . .  It makes the derailments more spectacular.  Not in a good way."

34.     When *Scripps News* showed Jared Cassity (safety director of SMART, the nation's largest railroad union) how Norfolk Southern's executive compensation rules could lead to large cash payouts by driving down the Operating Ratio by just a fraction of a percent, Cassity responded: "You're showing me numbers that I've not seen and that's – it really is disgusting."  Cassity continued: "What that tells me is the railroads are going to keep flirting with danger or flirting with disaster as long as people are getting rich."  He added:

> You have these executives that are getting rewarded and so the instructions keep coming down no matter what happens.  I want more.  I want more.  I want more and that's why you see the railroads saying that the train length is going to continue to grow no matter what.

35.     Further confirmation of the Company's priorities can be found in its allocation of capital.  According to *The New York Times*, over the past five years Norfolk Southern has paid shareholders nearly $18 billion through stock buybacks and dividends – reportedly twice the amount the Company has invested in its railway operations and safety.

**Norfolk Southern's Political Spending Likewise
Prioritized Its PSR Objectives over Safety**

36.     As the railroad industry and Norfolk Southern embraced PSR, they ramped up their lobbying efforts, including most notably in Columbus, Ohio, to prevent safety regulations that would increase costs and harm operating margins.  Legislative records obtained by *Scripps News* and others confirm that Norfolk Southern spent tens of millions of dollars over the years lobbying state governments (including the government of Ohio through lobbying efforts arising from Columbus), Congress, and federal agencies – trying to block potentially costly safety reforms on multiple occasions, including by opposing whistleblower protections and speed limits for high-hazard flammable trains.  Norfolk Southern has also opposed an ongoing federal effort to require a

minimum number of crew members on a train.  In December 2022, the Company reportedly told the FRA that running trains with a one-person crew is safe.

37.     In 2015, Norfolk Southern played a key role in defeating an Obama-era safety rule that was issued following a number of oil train accidents.  The rule required trains carrying oil or other hazardous liquids to be equipped with electronically controlled pneumatic ("ECP") brakes on their rail cars ("ECP Brake Rule").  While air brakes stop train cars individually, as air pressure moves sequentially from one car to the next, ECP brakes operate using an electronic signal which can stop an entire train much faster.  Notwithstanding the safety benefits, the Company retained 47 federal lobbyists to fight against the ECP Brake Rule.  Ultimately, the ECP Brake Rule was repealed in 2018.

38.     Lobbying and campaign donations occurred at the state level as well.  In Ohio alone, the Company made over 100 contributions to Ohio state officials and candidates totaling $98,000 over the last 5 years, according to data from Ohio's secretary of state.  In addition to directly supporting candidates, Norfolk Southern hired lobbyists to influence the course of legislation with the Company filing more than 200 state-required quarterly reports disclosing lobbying in the past 6 years.  In Ohio, the Company employs the well-connected Columbus-based lobbying firm called The Success Group.  Governor DeWine's former legislative director Dan McCarthy led the firm prior to joining the administration.  McCarthy was later implicated in facilitating the bribery of the former Ohio House of Representatives Speaker Larry Householder, who was convicted of racketeering conspiracy for taking $60 million from Ohio utility First Energy to assist that company in passing House Bill 6.  McCarthy resigned from the DeWine administration in September 2021.  The Success Group began representing Norfolk Southern in 2009.  Since then, the Company's lobbyists have repeatedly fended off legislation imposing a minimum staffing requirement of a 2-person crew or penalties for blocked railroad crossings.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

39.     The Class Period begins on October 28, 2020.  On that day, Norfolk Southern filed with the SEC a Form 8-K, which attached a copy of a press release the Company published that day announcing the Company's financial results for the quarter ended September 30, 2020.  The press release stated in pertinent part as follows:

"***Since launching our Precision Scheduled Railroading strategy, we have significantly enhanced Norfolk Southern's operational and financial performance and delivered superior returns for shareholders***," said James A. Squires, Norfolk Southern chairman, president and CEO.   "Given the impact of the COVID-19 pandemic on our industry and the broader economy, ***we quickly executed a plan to align our assets and resources with demand and generate sustainable margin improvement.  In addition to maintaining outstanding service levels with fewer resources and reduced headcount, we successfully idled our fifth hump in the last five quarters, helping Norfolk Southern achieve record productivity***.  With the resilience of our railroad, strong customer relationships and the hard work of our team, including new Chief Operating Officer and PSR veteran Cindy Sanborn, ***we are confident in our ability to achieve our goal of a 60% operating ratio with more to come, while delivering enhanced free cash flow and further value creation for Norfolk Southern shareholders***."

40.     On February 4, 2021, Norfolk Southern filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 10-K"), which was signed by defendants Squires and George.  The 2020 10-K stated: "***Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services***."

41.     In a section describing "HUMAN CAPITAL MANAGEMENT" with respect to "Safety," the 2020 10-K stated:

We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day.   Our commitment to an injury-free workplace is illustrated by our '*I am Coming Home*' safety message, which is featured prominently in our yards, shops, and facilities and further reinforces the importance of working safely.

42.     On March 31, 2021, Norfolk Southern filed with the SEC its annual proxy statement ("2021 Proxy Statement").  Included in the 2021 Proxy Statement was a letter to shareholders from the Company's Board, which stated in pertinent part as follows:

> **The Board is committed to safety as a core value of Norfolk Southern**, and we review safety topics regularly.  To allow us to delve into the topic on a deeper level and enhance our oversight of **the Corporation's commitment to safety**, we formed a standing Safety Committee in 2020 to review, monitor, and evaluate the Corporation's compliance with safety programs and practices.

43.     The 2021 Proxy Statement further stated in its "Corporate Responsibility Highlights" section: "Safety is a way of life at Norfolk Southern, extending beyond our rail operations and into the communities where we work.  This commitment is reflected by the Board of Directors establishing a Safety Committee."

44.     On February 4, 2022, Norfolk Southern filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 10-K"), which was signed by defendants Squires and George.  The 2021 10-K stated, "**Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services**."

45.     In a section describing "HUMAN CAPITAL MANAGEMENT" with respect to "Safety," the 2021 10-K stated:

> We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day.  Our commitment to an injury-free workplace is illustrated by our '*I am Coming Home*' safety message, which is featured prominently in our yards, shops, and facilities and further reinforces the importance of working safely.

46.     On March 31, 2022, Norfolk Southern filed with the SEC its annual proxy statement ("2022 Proxy Statement").  Included in the 2022 Proxy Statement was a letter to shareholders from the Company's Board which stated: "**The Board is committed to safety as a core value of Norfolk Southern**, and we continue to use our Safety Committee to consider safety topics regularly."  Later in its "ESG Highlights" section, the 2022 Proxy Statement stated: "**Safety is part of who we are.**

*Safety is core to our business and essential to achieving operational excellence. From our Board of Directors' Safety Committee to our local safety and service committees, safety is top down-bottom up*."

47. On January 25, 2023, Norfolk Southern held an earnings call with analysts and investors to discuss the Company's financial results and operations for the fourth quarter of 2022. In his prepared remarks, defendant Shaw stated in relevant part as follows:

> I was at the Midwest Association of Rail Shippers winter meeting last week, talking with customers about our new strategy. And the reactions were positive. Now our job is to prove it consistently. With performance, we made great strides to close the year and are encouraged by our progress. We will continue to refine and evolve to provide a service product to market values. ***Service is at the best it's been in more than 2 years***, and customers are noticing.

48. On February 3, 2023, Norfolk Southern filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2021 (the "2022 10-K"), which was signed by defendants Shaw, Squires, and George. The 2022 10-K stated: "***Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services***."

49. In a section describing "HUMAN CAPITAL MANAGEMENT" with respect to "Safety," the 2022 10-K stated:

> We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. Our commitment to an injury-free workplace is outlined in our Foundation of Safety policy which focuses on rules compliance, responsibility, relationships, and responsiveness.

50. The statements referenced in ¶¶39-49 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by each of the defendants as follows:

- 14 -

(a)     that Norfolk Southern's PSR, including its use of longer, heavier trains staffed by fewer personnel, had led to the Company suffering increased train derailments and a materially increased risk of future derailments;

(b)     that Norfolk Southern's PSR, including its use of longer, heavier trains staffed by fewer personnel, was part of a culture of increased risk-taking at the expense of reasonable safety precautions due to the Company's near-term focus solely on profits;

(c)     that Norfolk Southern's PSR, including its use of longer, heavier trains staffed by fewer personnel, rendered the Company more vulnerable to train derailments and train derailments with potentially more severe human, financial, legal, and environmental consequences;

(d)     that Norfolk Southern's capital spending and replacement programs were designed to prioritize profits over the Company's ability to provide safe, efficient, and reliable rail transportation services;

(e)     that Norfolk Southern's lobbying efforts had undermined the Company's ability to provide safe, efficient, and reliable rail transportation services;

(f)     that Norfolk Southern's commitment to reducing operating expenses as part of its PSR goals undermined worker safety and the Company's purported "commitment to an injury-free workplace" because the Company's PSR plan prioritized reducing expenses through fewer personnel, longer trains, and less spending on safety training, technology, and equipment such as hot bearing wayside detectors (a/k/a "hotboxes") and acoustic sensors;

(g)     that Norfolk Southern's rail services were, as a result of its adoption of PSR principles, more susceptible to accidents that could cause serious economic and bodily harm to the Company, the Company's workers, the Company's customers, third parties, and the environment;

(h)     that Norfolk Southern had failed to put in place responsive practices and procedures to minimize the threat to communities in the event that these communities suffered the derailment of a Norfolk Southern train carrying hazardous and toxic materials; and

(i)     that, as a result of (a)-(h) above, defendants' Class Period statements detailed above regarding the safety of Norfolk Southern's operations were materially false and/or misleading.

51.     In addition, throughout the Class Period Norfolk Southern's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Norfolk Southern common stock] speculative or risky" and an explanation of "how [the] risk affect[ed] [Norfolk Southern]."  Norfolk Southern's periodic financial filings during the Class Period failed to disclose known trends and uncertainties and the true risks arising out of the Company's lax safety culture and implementation of PSR in violation of Item 303 and Item 105.  Indeed, the purported risk disclosures provided in Norfolk Southern's periodic financial filings were themselves materially misleading because they created the false and misleading impression that Norfolk Southern had adequately addressed the risks discussed and failed to disclose the extent of safety problems that had already occurred at the Company.

52.     The true facts, however, began to be revealed after the market closed on Friday, February 3, 2023.  On that evening, about 8:54 p.m. Eastern Standard Time, eastbound NSR general merchandise freight train 32N derailed 38 railcars in East Palestine, Ohio, about a mile from the Ohio-Pennsylvania border, leaving behind what the *Associated Press* called "a mangled and charred

mass of boxcars and flames." Train 32N was made up of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive. Although no formal regulatory definition exists, 150 cars is the FRA's threshold for classifying a train as "very long."[3] Train 32N was being operated by just three Norfolk Southern personnel that day: a conductor, an engineer, and a conductor-in-training.

53. Even though the train was not officially classified as a hazardous material train, which would have required the Company to post and display notification of its cargo, the consist (*i.e.*, the group of rail vehicles which make up a train) included 20 placarded hazardous materials tank cars transporting liquids, flammable liquids, and flammable gas. Among the hazardous materials being transported were vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, and butyl acrylate. The derailed equipment included 11 tank cars carrying hazardous materials that subsequently ignited, fueling fires that damaged an additional 12 non-derailed railcars. The crash created a roughly 50-car pileup – one third the train's length, as reflected in the following photograph of the derailment:

---

[3] In a 2019 study, the Government Accountability Office said 150 cars is more than twice the average length of freight trains operated by major railroads from 2008 through 2017.



54.     According to a subsequent preliminary investigative report about the accident by the

National Transportation Safety Board ("NTSB"), the derailment occurred after a wheel bearing[4] on a

hopper car (a type of railroad freight car used to transport loose bulk commodities such as coal, ore,

and grain) overheated and failed.  In this instance, the hopper car contained plastic pellets, and the

combination of the hot axle and plastic pellets started an initial fire.  Video surveillance from a

business 20 miles out of East Palestine showed the axle had been on fire for at least 20 miles before

the derailment occurred.

55.     On Sunday, February 5, 2023, Ohio Governor Mike DeWine ordered the immediate

evacuation of those within a one-mile by two-mile area near the derailment site, with the Governor

warning of a pending potentially deadly explosion in pertinent part as follows:

---

[4]     Railcar bearings are essential to the safe and efficient operation of a train.  Inside each
bearing is a series of spinning rollers that surround both ends of a turning axle.  When lubricated
they allow for limited friction while also supporting the weight of the railcar.  If a bearing gets too
hot, usually from the loss of lubricant, it can melt, causing the bearing to seize up or come off the
axle.  The resulting damage can throw a railcar out of alignment and cause it to jump the tracks.

Following an evening briefing regarding the train derailment in East Palestine, Governor DeWine and Columbiana County officials are issuing an urgent warning to those living within a mile of the derailment. *Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile*.

*Although teams are working to prevent an explosion from happening, residents living within a mile of the site are advised to immediately leave the area*. While most individuals in the one-mile radius have already evacuated, local officials say that more than 500 people have declined to leave their homes.

*Those who have the means to leave are advised to immediately evacuate. Those who need help evacuating the area should call 330-426-4341. According to the Columbiana County Sheriff, those with children in their homes who decline to evacuate may be subject to arrest*.

At approximately 8 p.m., Governor DeWine activated the Ohio National Guard to deploy to the scene to assist local authorities. The Ohio State Highway Patrol, Ohio Emergency Management Agency, and Ohio EPA are also assisting.

56. Also that day, *although responders had mitigated the fire, five derailed tank cars carrying 115,580 gallons of vinyl chloride continued to concern authorities because the temperature inside one tank was still rising, suggesting that the vinyl chloride was undergoing a polymerization reaction, which could pose an explosion hazard. Responders scheduled a controlled venting of the five vinyl chloride tank cards to release and burn the vinyl chloride, expanded the evacuation zone to a 1-mile by 2-mile area, and dug ditches to contain released vinyl chloride liquid while it vaporized and burned*.

57. Of particular concern were the tank cars "exposed to fire" that contained over 115,000 gallons of vinyl chloride. Vinyl chloride is a flammable petrochemical used in the manufacture of polymer polyvinyl chloride ("PVC") – a common plastic used to make PVC pipe that can be found in most local hardware stores. Vinyl chloride has a boiling point of 7.88 degrees Fahrenheit and, when exposed to heat, can undergo a rapid polymerization reaction that can pose an explosion hazard. Heightening the risks, vinyl chloride is classified by the U.S. Center for Disease Control ("CDC") as a carcinogen (linked to causing liver cancers), with the U.S. Consumer Product

Safety Commission ("CPSC") having banned its use in household aerosol spray cans in 1974. The CDC notes that "the lowest levels [of vinyl chloride] that produce liver change, nerve damage, and alterations in immunity in people are not known."

58.   When burned, vinyl chloride becomes hydrogen chloride and phosgene. Phosgene is a deadly gas that was used in chemical warfare during World War I. Kimberly Garrett, an environmental toxicologist from Northeastern University, told *Newsweek* that phosgene is likely the chemical that officials were most worried about, stating: "It disrupts the interaction between the lungs and the bloodstream. It makes it so oxygen can't get into the blood and carbon dioxide can't get out." When hydrogen chloride dissolves in water, it becomes hydrochloric acid potentially forming a component of acid rain.

59.   On February 6, 2023, responders engaged in a controlled detonation and burn of the vinyl chloride, spewing massive volumes of chemicals into the vicinity, as reflected in the following photograph:



60.    The chemicals released from the derailment entered the air and water of the surrounding residential areas, the closest of which were only 1,000 feet from the site of the accident. The plume of smoke from the inferno was reportedly thousands of feet high and visible for miles. Reports cited thousands of dead fish, chemical slicks in the water, and chemical odors in the air around the blast site.

61.    On this news, the price of Norfolk Southern stock fell on February 6, 2023, closing at $246.46 per share – down $5.66 per share from its closing price of $252.12 per share on Friday, February 3, 2023 – inflicting significant losses on Norfolk Southern shareholders.

62.    The price of Norfolk Southern stock remained inflated, however, as defendants continued making materially false and misleading statements.  For instance, on February 22, 2023, during an investor conference organized by Barclays Bank PLC, defendant George commented on the derailment in East Palestine, stating:

> [S]afety really is our #1 priority in Norfolk Southern.  And you can see the progress we've made over the past decade on far fewer derailments than we've ever had.  And even all of our safety metrics have gone in the right direction.  It is – it has been and it will be a top priority for this company.

63.    On February 8, 2023, Governor DeWine's evacuation order was lifted, permitting the local population to return.  Governor DeWine also stated that Norfolk Southern was "the one[] who created the problem.  It's their liability.  They're the ones who ought to pay for it."  Following their return, numerous residents reported hazardous air quality and other health and environmental concerns.

64.    On this news, the price of Norfolk Southern stock fell on February 9, 2023, closing at $238.98 per share – down $7.64 per share from its closing price of $246.62 per share on February 8, 2023 – inflicting significant losses on Norfolk Southern shareholders.

- 21 -

65. On February 13, 2023, the EPA stated that it had concluded that Norfolk Southern may be responsible for the cleanup costs of the derailment site or the costs incurred by the EPA for area cleanup.

66. On this news, the price of Norfolk Southern stock fell on February 13 and February 14, 2023, closing at $235.28 per share – down $7.33 per share from its closing price of $242.61 per share on Friday, February 10, 2023 – inflicting significant losses on Norfolk Southern shareholders.

67. On February 15, 2023, reports emerged that Ohio Attorney General Dave Yost was considering taking legal action against Norfolk Southern over the derailment. In a letter to the Company, he noted: "The pollution, which continues to contaminate the area around East Palestine, created a nuisance, damage to natural resources and caused environment harm."

68. On this news, the price of Norfolk Southern stock fell on February 16 and 17, 2023, closing on February 17, 2023 at $228.15 per share – down $10.14 per share from its closing price of $238.29 per share on February 15, 2023 – inflicting significant losses on Norfolk Southern shareholders.

69. On February 21, 2023, the EPA issued a unilateral administrative order requiring Norfolk Southern to pay for all cleanup actions at the site. EPA Administrator Michael Regan said at a press conference that day in East Palestine that the agency was using its power under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") to force the Company to act. "Norfolk Southern will pay for cleaning up the mess that they created and for the trauma that they've inflicted on this community," Regan said. "If the company fails to complete any actions as ordered by EPA, the Agency will immediately step in, conduct the necessary work, and then force Norfolk Southern to pay triple the cost."

70. As part of the order, Regan stated that Norfolk Southern must do the following:

- Identify and remove all contaminated soil and water from the area;

- Safely transport and dispose of contaminated soil and water properly as defined by EPA specifications;

- Reimburse the EPA for any cleanup services the agency offers affected residents and businesses; and

- Attend and participate in public meetings at the EPA's request while maintaining full transparency with the public.

71. Also appearing at the press conference were Governor DeWine and Pennsylvania Governor Josh Shapiro, both of whom confirmed the need to hold Norfolk Southern accountable and help the people impacted in both states. DeWine said Norfolk Southern should be responsible for paying all damages caused by the derailment, including by compensating residents for health issues caused by the derailment. He stated: "The railroad needs to pay for anything that they caused, [and] anything that they did." Shapiro was particularly critical of the Company, stating: "They chose not to participate in the unified command. They gave us inaccurate information and conflicting modeling data, and they refused to explore or articulate alternative courses of action when we were dealing with the derailment in the early days." Shapiro added that his office has made a criminal referral to the Pennsylvania Attorney General's office.

72. In a statement to *CNN*, Norfolk Southern responded to the EPA's announcement, stating: "We recognize that we have a responsibility, and we have committed to doing what's right for the residents of East Palestine." Norfolk Southern continued: "We have been paying for the clean-up activities to date and will continue to do so. We are committed to thoroughly and safely cleaning the site, and we are reimbursing the residents for the disruption this has caused in their lives."

73. On February 23, 2023, the NTSB issued a preliminary report regarding the derailment. Detailing the report at a Washington, D.C. news conference, NTSB Chairwoman Jennifer Homendy said:

I can tell you this much: This was 100% preventable. We call things "accidents." There is no accident. Every single event that we investigate is

preventable. So our hearts are with, you know, that the NTSB has one goal and that is safety. And ensuring that this never happens again . . . .

*     *     *

We know what happened: A wheel bearing failed.

74.     According to the NTSB, the wheel bearing passed three hot bearing detectors prior to the derailment, with the temperature increasing each time. However, the hot bearing detectors would not have notified the crew to stop and inspect the wheel bearing until it recorded a temperature 170 degrees or higher, per Norfolk Southern rules. "It wasn't until it was 253 degrees Fahrenheit above ambient temperature that [the crew] got a notification that they needed to immediately stop and inspect the hot axle and possibly set out the car," Homendy said.

75.     On March 1, 2023, it was reported that defendant Shaw agreed to testify on the East Palestine derailment before the U.S. Senate Environment and Public Works Committee on March 9, 2023. Also set to testify at the Senate hearing were EPA regional administrator Debra Shore, Ohio Environmental Protection Agency Director Anne Vogel, and two local officials who were set to address "environmental and public health threats" from the derailment.

76.     On Saturday, March 4, 2023, another Norfolk Southern freight train derailed near Springfield, Ohio. About 20 of the train's 212 cars derailed but officials said no hazardous materials spilled and no injuries were reported, further revealing the extent of Norfolk Southern's safety lapses.

77.     Before the market opened on Monday, March 6, 2023, the Company announced a 6-part plan to improve operational safety that included, *inter alia*, adding about 200 temperature sensors along its tracks where existing sensors are at least 15 miles apart, reviewing the temperature levels that set off alarms for train crews, and adding more acoustic sensors that analyze vibrations for potential problems.

78.     On this news, the price of Norfolk Southern stock fell on March 6 and March 7, 2023, closing at $215.18 per share – down $13.21 per share from its closing price of $228.39 on Friday, March 3, 2023 – inflicting additional losses on Norfolk Southern shareholders.

79.     On March 7, 2023, the NTSB announced that it had opened a special investigation into safety practices at Norfolk Southern because the Company had suffered five significant accidents since December 2021.  Three of the five accidents resulted in the deaths of Company employees.  The investigation was to focus on Norfolk Southern and its "safety culture," the NTSB said.  "Given the number and significance of recent Norfolk Southern Accidents, the [NTSB] also urges the company to take immediate action today to review and assess its safety practices, with the input of employees and others, and implement necessary changes to improve safety."

80.     Later that same day, the FRA announced it would conduct a 60-day supplemental safety assessment of Norfolk Southern operations.  "After a series of derailments and the death of one of its workers, we are initiating this further supplemental safety review of Norfolk Southern, while also calling on Norfolk Southern to act urgently to improve its focus on safety so the company can begin earning back the trust of the public and its employees," said U.S. Transportation Secretary Pete Buttigieg in a press release.

81.     On March 14, 2023, Ohio Attorney General Dave Yost filed a complaint against Norfolk Southern alleging trespass, nuisance, negligence, open dumping, and water and discharge violations in connection with a series of Norfolk Southern train derailments, including the derailments in East Palestine, Ohio and Springfield, Ohio.

82.     On March 15, 2023, the price of Norfolk Southern stock fell to a low of less than $203 per share – ***19% below*** the price of the stock prior to the East Palestine train derailment – as a result of the numerous disclosures and revelations regarding the East Palestine and Springfield

derailments and other revelations regarding Norfolk Southern's true operations, which stood in contrast to defendants' Class Period representations.

83.     As a result of defendants' wrongful acts and omissions, and the precipitous declines in the market value of Norfolk Southern stock, plaintiff and other Class members have suffered significant losses and damages for which they seek redress through this action.

## ADDITIONAL SCIENTER ALLEGATIONS

84.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Norfolk Southern, and their control over and/or receipt and/or modification of Norfolk Southern's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

85.     Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. The Individual Defendants also had the motive and opportunity to commit fraud, with a significant portion of their compensation tied to hitting PSR targets as detailed herein.

86.     The Individual Defendants, because of their positions with Norfolk Southern, controlled the contents of Norfolk Southern's public statements during the Class Period. The

Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, each of the defendants is responsible for the accuracy of Norfolk Southern's corporate statements and is, therefore, responsible and liable for the representations contained therein.

87. Defendants' scienter is further underscored by the mandated certifications under the Sarbanes-Oxley Act of 2002 of the Individual Defendants filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Norfolk Southern was made known to them and that the Company's disclosure-related controls were operating effectively.

88. On March 9, 2023, defendant Shaw testified before the U.S. Senate's Environment and Public Works Committee. In his testimony, Shaw apologized for the derailment in East Palestine, and admitted some of the Company's safety failures. "It is clear the safety mechanisms in place were not enough," he said. Shaw further admitted that the Company had previously been focused solely on profits, not safety: "***We're going to move away from a near-term focus <u>solely</u> on profits and take a long-term view***," he continued.

## NO SAFE HARBOR

89. Norfolk Southern's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting

Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

90.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of Norfolk Southern who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE;
## FRAUD ON THE MARKET

91.     At all relevant times, the market for Norfolk Southern common stock was an efficient market for the following reasons, among others:

(a)     Norfolk Southern stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's Form 10-K for the fiscal year ended December 31, 2022, Norfolk Southern had more than 227 million shares outstanding as of January 31, 2023 (excluding 20,320,777 shares held by the registrant's consolidated subsidiaries);

(c)     as a regulated issuer, Norfolk Southern filed periodic public reports with the SEC;

(d)     Norfolk Southern regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press

releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Norfolk Southern was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

92.     As a result of the foregoing, the market for Norfolk Southern common stock promptly digested current information regarding Norfolk Southern from publicly available sources and reflected such information in the price of Norfolk Southern common stock.   Under these circumstances, all purchasers of Norfolk Southern common stock during the Class Period suffered similar injury through their purchases of Norfolk Southern common stock at artificially inflated prices, and a presumption of reliance applies.

93.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.   Because this action involves defendants' failure to disclose material adverse information regarding Norfolk Southern's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

94.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Norfolk Southern common stock and operated as a fraud or deceit on Class Period purchasers of Norfolk Southern common stock by misrepresenting the value of the Company's business and prospects by concealing the actual safety risks existing in the Company's

operations. As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein. As a result of their purchases of Norfolk Southern common stock during the Class Period, plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

95. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Norfolk Southern during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

96. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Norfolk Southern common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Norfolk Southern or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

97. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

98.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

99.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations, and commitment to safety of Norfolk Southern; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

100.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

101.    Plaintiff incorporates ¶¶1-100 by reference.

102.    During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Norfolk Southern common stock during the Class Period.

104.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Norfolk Southern common stock. Plaintiff and the Class would not have purchased Norfolk Southern common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

105.     Plaintiff incorporates ¶¶1-104 by reference.

106.     Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 16, 2023                    MURRAY MURPHY MOUL + BASIL LLP
                                          JOSEPH F. MURRAY


                                          s/ Joseph F. Murray
                                          _____
                                          JOSEPH F. MURRAY (Bar No. 0063373)
                                          1114 Dublin Road
                                          Columbus, OH 43215
                                          Telephone:  614/488-0400
                                          614/488-0401 (fax)
                                          E-mail:  murray@mmmb.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          E-mail:  srudman@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          RICHARD GONNELLO
                                          420 Lexington Avenue, Suite 1832
                                          New York, NY  10170
                                          Telephone:  212/432-5100
                                          E-mail:  rgonnello@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  bcochran@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Bucks County Employees Retirement System ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Pitman v. Immunovant, Inc.*, No. 1:21-cv-00918 (E.D.N.Y.)
*Faille v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp.*, No. 2:21-cv-03382 (E.D. Pa.)

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of March, 2023.

Bucks County Employees Retirement System

By: _____

Joseph J. Khan, County Solicitor

NORFOLK SOUTHERN

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|---|---|---|
| 10/08/2021 | 261 | $264.88 |
| 10/11/2021 | 1 | $264.75 |
| 11/17/2021 | 199 | $274.60 |
| 03/01/2022 | 1,415 | $254.77 |

Prices listed are rounded up to two decimal places.